Ronald P. Mysliwiec, Esq. (RM 8926)
Law Offices of Ronald P. Mysliwiec
Attorneys for Plaintiff
530 Third Street
Brooklyn, New York 11215
(718) 768-4581
rpm@rpmlawny.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHRISTINE DUBOV,

                          Plaintiff,

          -against-                                                1:18 CV 03854

JALEEL HASAN LEWIS, FREEMAN YOUNG PERRY, EMRI                      **COMPLAINT**
CAPITAL LLC, NEW YORK MED GROUP NYC LLC, EQUITY
CAPITAL PARTNERS LLC  and EQUITY CAPITAL                            (JURY TRIAL DEMANDED)
PARTNERS OF NEW YORK LLC,

                          Defendant.

          Plaintiff Christine Dubov ("Dubov"), by her attorneys, The Law Offices of Ronald P.

Mysliwiec, for her complaint against defendants: Jaleel Hasan Lewis ("Lewis"); Freeman Young

Perry ("Perry"); EMRI Capital LLC ("EMRI"); New York Med Group NYC LLC ("NY Med"); Equity

Capital Partners LLC ("ECP") and Equity Capital Partners of New York LLC ("ECPNY") (together

defendant ("ECP LLC") alleges:

                          **THE NATURE OF THIS LAWSUIT**

          1.        This is a diversity action arising out of the swindling of plaintiff Dubov, a 68-year-

old widow of 12 years and a California resident, of $325,269.38.  The central figure in the

swindling scheme is defendant Lewis.  All the claims made by plaintiff Dubov herein are

common law claims.

**THE PARTIES**

2.      Plaintiff Dubov, 68 years of age and a widow since 2006, is a natural person who resides in California.  She moved to California in May 2017.  Prior to that she had been a resident of New York City for many years, from January 2007 through April 2017.

3.      Defendant Lewis is a natural person, 46 years of age, and, since in or about December 2017, has resided in a home in Englewood Cliffs, NJ with his wife, Ireti Natasha Bobb Lewis.  That home which the Lewises own and occupy was purchased in or about December 2017 for $2.7 million.  The home contains approximately 5,000 square feet of living space, has five bedrooms, six full bathrooms and two half-baths.

4.      Defendant Perry is a natural person residing in the Bedford-Stuyvesant neighborhood of Brooklyn, New York where he owns a row house.

5.      Defendant EMRI is a Delaware LLC, created in 2008.  Upon information and belief, defendant EMRI's principal place of business since December 2017 is located at the residence of defendant Lewis in Englewood Cliffs, NJ.  Prior to that, including from 2012 through November 2017, defendant EMRI's principal place of business was located at defendant Lewis' residence in Ft. Lee, NJ.  At all times relevant to this Complaint, defendant EMRI did its banking at the Bergen Mall branch of Chase Bank in Maywood, NJ, approximately eight miles from Ft. Lee, NJ, and ten miles from Englewood Cliffs, NJ.

6.      Defendant NY Med is a New York LLC, created by defendant Lewis in 2017 with its principal place of business at 40 Wall Street, 28th Floor, New York, NY.

7.      Defendant ECP is a New York LLC, created in 2005, with its principal place of business at 40 Wall Street, 28th Floor, New York, NY.

2

8.      Defendant ECPNY is a Delaware LLC created in 2007, registered to do business in New York in 2008, and has its principal place of business at 40 Wall Street, 28th Floor, New York, NY.  When created in Delaware in 2007, defendant ECPNY registered in Delaware as "Equity Capital Partners LLC".  Under New York law it could not then take that same name when doing business in New York because that name had already been taken in 2005 by defendant ECP. Thus, the Delaware "Equity Capital Partners LLC had to register in New York in 2008 as "Equity Capital Partners of New York LLC".

9.      The available evidence indicates that defendants ECP and ECPNY are closely related.  They share an address at 40 Wall Street, New York, NY (along with defendant NY Med). It appears that those two entities are operated as one under the name and style of Equity Capital Partners LLC (together "ECP LLC").

## SUBJECT MATTER JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this lawsuit pursuant to 28 U.S.C. §1332 by virtue of the diversity of citizenship of the plaintiff and the defendants and the fact that the amount in controversy exceeds the sum of seventy-five thousand dollars ($75,000.00) exclusive of interest and costs.

11.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) and (3) because a substantial part of the events or omissions giving rise to plaintiff's claims occurred in this District, and at least two defendants are subject to this Court's personal jurisdiction with respect to this action.

**PERSONAL JURISDICTION**

12.     This Court has personal jurisdiction over defendants, Lewis, Perry, ECP LLC, and NY Med because they reside in, were created in, and/or do business in the State of New York and have transacted business in the State of New York giving rise to the claims herein.

13.     This Court has personal jurisdiction over defendant EMRI because it has transacted business in the State of New York giving rise to the claims herein.

**FACTUAL ALLEGATIONS**

**A.  Plaintiff Dubov's Contracts With Defendants ECP LLC, And Perry.**

14.     On or about June 26, 2012, plaintiff entered into an "Engagement Agreement", also denominated as a "Financial Commodity Enhancement Agreement", with defendant ECP LLC.  That agreement stated:

> "Initially, ECP has been engaged to increase the amount of the client's initial investment of $310,000.00 USD through the establishment of a series of Brazilian Long Term Notes (Government bonds) equal to a total of 20% return per 90 days of each (financial engagement agreement). ECP will achieve this goal through the electronic registration and sale of the [sic] each Bond ECP has procured.  The funds will be derived from the proceeds of the closing of the sale of each individual asset.  The client has the right to receive from ECP an interest payment and whatever has been earned, after 90 days of receipt of the client's initial investment.  The client will be eligible to receive their first interest payment after the first 90 days from receipt of their initial investment.  Once the interest payments begin, the client will receive the interest payments on a monthly basis.  The term of this investment shall be for one year with the opportunity to renew the investment every year for a period of five years.  The client's principle [sic] investment is fully guaranteed by Equity Capital Partners LLC and is secured by a Brazilian legal counsel, or whosoever was retained for the execution of this off shore transaction, for the Brazilian Long Term Notes for the duration of the investment."

(Exhibit 1.)

15.    This two-page agreement was not clear in several respects.  Indeed, it has the look of a document marked up on the word processor from some template or prior agreement. (It was entirely created by defendants Lewis, Perry, or ECP LLC.)  However, in its most essential term – the money to be paid to plaintiff Dubov on her investment and the schedule on which that money was to be paid -- it was clear enough.

16.    On or about July 10, 2012, plaintiff Dubov entered into a second agreement with defendant ECP LLC.  That July 10, 2012 agreement (the "FCEA,") was identical in every respect to the June 26, 2012 version , except for the increased dollar amount in  the first sentence of the second paragraph:

> "Initially, ECP has been engaged to increase the amount of the client's initial investment of $325,269.38 USD through the establishment of a series of Brazilian Long Term Notes (Government bonds) equal to a total of 20% return per 90 days of each (financial engagement agreement)."

(Exhibit 2 at 1.)

17.    This FCEA was executed by defendant Lewis as "Senior Vice President" of defendant ECP LLC.  It was also executed by defendant Perry.   Perry is identified as the CEO of defendant ECP LLC on that entity's website, but his signature on the FCEA lists no title or affiliation with defendant ECP LLC.  He executed the FECA in his individual capacity and is, thus, individually bound thereby.  The earlier June 26, 2012 version of the FCEA had also been executed by defendant Lewis as Senior Vice President of defendant ECP LLC, and by defendant Perry in his personal capacity.

18.    The FCEA appears to have been a written amendment or replacement for the June 26, 2012 agreement between plaintiff Dubov and defendant ECP LLC.  As such it was in

compliance with the amendment-in-writing requirement set forth on the second page of each

of these almost identical documents.  There were no further amendments to the FCEA.

19.     On July 3, 2012, plaintiff Dubov transferred $120,992.32 to defendant ECP  LLC.

(Exhibit 3.)

20.     On July 5, 2012, plaintiff Dubov transferred another $204,777.06 to defendant

ECP LLC, completing her obligation under the July 10, 2012 amended FCEA. (Id.)

21.     According to that July 10, 2012 FCEA:

> "The client [plaintiff] has the right to receive from ECP an interest
> payment and whatever has been earned, after 90 days of receipt of the
> client's initial investment.  The client will be eligible to receive their [sic]
> first interest payment after the first 90 days from receipt of their [sic]
> initial investment.  Once the interest payments begin, the client will
> receive the interest payments on a monthly basis."

(Exhibiit 2 at 1.)

22.     Thus, under a reading of  the terms of the FCEA most favorable to defendants,

plaintiff Dubov should have received an interest  payment of $21,685.60 on October 5, 2012,

and on the fifth day of each month thereafter through July 5, 2013: a total of $216,856.  Also,

unless she opted to renew the FCEA on the date of its first anniversary (July 10, 2013), she was

entitled to receive back in full on that date her $325,269.38 principal investment.

23.     Instead of receiving the partial interest payments of $108,428 to which she was

entitled by February 5, 2013, under the FCEA, plaintiff had received no interest payments by

that date.

24.     While she had received four payments totaling $21,000 by November 1, 2013, all

of the payments had come from defendant EMRI, an entity about which plaintiff had received

no information.  Plaintiff Dubov started to express her concern about the interest payment

shortfall to defendants Lewis and Perry by November 14, 2013, when she left telephone messages for both of them.   On November 15, 2013, plaintiff Dubov spoke to defendant Lewis who told her that "the Brazilian bonds fell through," that they had "formed another company" for her investment, and he was "still ironing out" her "physical investment with [defendant] Freeman [Perry]".  Defendant Lewis did not identify the company which he said "they" had formed.

25.     Defendant Lewis never offered to return plaintiff Dubov's investment of principal, even though the FCEA committed plaintiff's money only to an investment in Brazilian Long Term Notes, and expressly provided:

> "This Agreement may be amended or modified only with the mutual written consent of all the parties."
>
>      *      *      *      *
>
> "The client's principle [sic] is fully guaranteed by Equity Capital Partners LLC."

(Exhibit 2 at 1 - 2.)

26.     Plaintiff Dubov, the widow of an invested Cantor and a person with absolutely no experience in matters of business or finance, was perplexed by this revelation.

27.     On December 4, 2013, plaintiff Dubov again spoke with defendant Lewis, but received no further information.  Plaintiff Dubov left unanswered telephone messages for defendant Lewis on December 20 and 21, 2013.

## B.   Defendant Lewis' Repudiation Of The FCEA And The Alleged Medco International Investment.

28.     Neither prior to transferring her money to defendant ECP LLC in July 2012, nor on that occasion, nor for many months thereafter, did plaintiff Dubov ever meet with either

defendants Lewis or Perry in person. On or about December 13, 2013, plaintiff began to ask

defendant Lewis to meet.  Defendant Lewis kept on putting plaintiff Dubov's meeting requests

off, giving various excuses.  Finally, in the afternoon of February 26, 2014, they met at *Nice

Matin*, a restaurant located at 201 W. 79th Street, NY, at the corner of 79th Street and

Amsterdam Avenue.

29.     At that meeting defendant Lewis told plaintiff Dubov, for the first time,  that her

entire $325,269.38 purportedly had been invested in an enterprise he vaguely identified only as

"Medco International." He didn't explain to her whether it was a public company or whether it

was non-public. He didn't tell her the liquidity and other problems that attend a minority

interest in a privately held company.  According to defendant Lewis, Medco International sold

"medical supplies for operating rooms".  Defendant Lewis specifically told plaintiff at their face-

to-face meeting that there was an "insurance policy" protecting her investment in Medco

International.

30.     Plaintiff tried to make inquiries of defendant Lewis as to the nature of the

business, and the identities of the customers of Medco International.  To follow up her original,

oral inquiries, plaintiff wrote defendant Lewis a text message on March 4, 2014, stating:  "Just a

reminder to send the lists of products and buyers and insurance policy.  Thanks so much."  In

response, defendant Lewis sent plaintiff nothing.

31.     A Google search of "Medco International" reveals four U.S. entities with that

name, all privately held.  Only one, Medco International LLC, had been created prior to the

February 26, 2013 meeting, and it was in Nevada.  The records of the Nevada Division of

Corporations currently indicate that the status of that entity is "permanently revoked".

32.    There were three other entities created in the United States under the name "Medco International" after the February 26, 2013 meeting between plaintiff Dubov and defendant Lewis.  One, still in business, is a medical software company consisting of a single employee and located in Drexel Hill, in Pennsylvania. It was started on October 8, 2014.  The second Medco international was an LLC in Puerto Rico, created in 2015 but now listed by Puerto Rico's Division of Corporations as "dissolved".  The third Medco International is an active Delaware LLC, created in June 2013.  The only address for the entity listed by the Delaware Division of Corporations is a mail drop in Delaware.

33.    At their February 26, 2013 meeting, defendant Lewis did not tell plaintiff Dubov whether the "Medco International" of which he spoke was an entity that had already been formed (Nevada) or one that was to be formed (Delaware, Pennsylvania or Puerto Rico), nor did he give her sufficient information that would allow her independently to investigate the prospects of the company.

34.    Plaintiff Dubov never again met face-to-face with defendant Lewis, in spite of plaintiff's countless attempts to arrange such a meeting, all as recorded in the transcript of plaintiff's text messages with defendant Lewis. (Exhibit 4.)  What followed was four years of texts and calls between them as detailed in Exhibit 4. [1]

35.    At the time, up to and including April 6, 2018, plaintiff Dubov felt that she had no recourse but to accept defendant Lewis' announcement of a *fait accompli* with respect to the alleged reallocation of her funds, and thereby to mitigate her damages as best she could.

---

[1] The full chronological transcript of the text messages between plaintiff Dubov and defendant Lewis is 90 pages long.  It is too long to be accepted as a single exhibit by the S.D.N.Y. ecf system, even if the resolution is decreased to 100 dpi.  Thus, plaintiff has divided that transcript into three exhibits, nos. 4, 5 and 6.  However, the entire, chronological transcript is bates stamped sequentially from 1 to 90.  Pages 1-30 comprise Exhibit 4; pages 31-60 comprise Exhibit 5; and pages 61-90 comprise Exhibit 6.

**C. Defendant Lewis' Alleged Involvement with Medco International, His Promise To Pay Plaintiff's Potential Tax Penalties, And His Assurances To Buy Her Out.**

36.     Defendant Lewis never told plaintiff Dubov whether she was allegedly investing in an existing company or only a company to be formed, nor where the company was located. He never explained to plaintiff Dubov what form her purported investment in Medco International took.   He simply didn't respond to any of her questions on those issues.

37.     Plaintiff never knew whether she was: a shareholder in a public or private corporation; a lender to Medco International, to ECP LLC, or to defendants ERMC or Lewis; or a partner in a partnership or a member of an LLC.  While she repeatedly and over the course of years asked for the paperwork that defined her status and the status of her funds, defendant Lewis simply ignored each and every one of her requests.

38.     Defendant Lewis' failure and refusal to provide such information to plaintiff Dubov, over the course of years, constitutes a material omission on the part of defendant Lewis and, further, suggests that the entity to which he referred was either an invention or a conduit to conceal his complete possession, custody and control of plaintiff Dubov's funds.  Those omissions support a cogent and compelling inference that his intent was to mislead, deceive, manipulate and cheat plaintiff Dubov.

39.     For more than four years from their face-to-face meeting in New York City on February 26, 2014, to the present time, defendant Lewis, *via* numerous text messages to plaintiff Dubov, repeatedly detailed his apparently full-time activities on behalf of the company which he had identified as Medco International, including alleged endless rounds of:  customer

solicitation, supplier visits and his search for new and additional sources of financing for that entity. On January 13, 2017, defendant Lewis created defendant NY Med.

40.    Plaintiff Dubov does not know: whether her money was ever invested in any of the four "Medco International" companies, or, if so, for how long; or what relationship, if any, Medco International now has, or ever had, with defendants Lewis, NY Med or EMRI .

41.    On or about November 16, 2015, defendant first advised plaintiff Dubov directly that she was at risk of being assessed a tax penalty when she transferred the $325,269,38 from her Fidelity IRA account to defendant ECP LLC on July 3 and July 5, 2012. On April 6, 2016, plaintiff Dubov, *via* text message, demanded assurances that any such tax penalties would "be absorbed by the company and not by me personally." (Exhibit 5 at 31.)

42.    Defendant Lewis responded *via* text message with a clear and unambiguous promise. "I know Christine I will do that, we will absorb the penalty." (Id.)

43.    Plaintiff Dubov reasonably relied on defendant Lewis' promise to her detriment. Upon defendant Lewis' promise, she neither demanded the immediate return of her money nor did she sue defendant Lewis.

44.    Beginning on or about May 6, 2016, defendant Lewis advised plaintiff Dubov that he was seeking an insured loan to buy her out of her investment, "that can get you [plaintiff Dubov] the lump sum, the last step is from the insurance company that is insuring the loan." (Exhibit 5 at 32.) Thirteen months later, on June 29, 2017, defendant Lewis texted plaintiff Dubov that, "the loan is almost done". (Exhibit 6 at 73.) On September 18 2017, he texted her in response to her inquiry about the "loan status". He wrote: "Almost finished wrapping up in the next 3 weeks. (Exhibit 6 at 74.)

45.     On October 30, 2017, plaintiff Dubov texted defendant Lewis: "Can you please touch base with me about my loan?" (Exhibit 6 at 78.) Defendant Lewis responded on October 31, 2017, "They are finishing the attorney review the attorney was out this week. I will have something by next week…." (Id.) According to the records of the Bergen County, NJ, Clerk, defendant Lewis and his wife received a $2.1 million mortgage from PHH Home Loans LLC on or about December 7, 2017.

46.     On February 22, 2018, plaintiff Dubov texted defendant Lewis: "I was under the impression that securing this loan would mean I would be receiving my principal back and dissolving this relationship." (Exhibit 6 at 88.)   Defendant Lewis responded: "Yes that is the case the loan is in the final stages, it is currently under review with the lender. I expect to have the feedback and confirmation in the next few days." (Id.) Defendant Lewis said nothing to plaintiff Dubov about the new home or the mortgage loan he had already received thereon on December 7, 2017.

47.     At the beginning of April 2018, the loan was just around the corner according to defendant Lewis. (Exhibit 6 at 90.)

48.     In making his promise to pay plaintiff Dubov's potential tax penalties and by falsely informing her that he was seeking to obtain a loan to buy out her investment in "Medco International", defendant Lewis sought to mislead, deceive, manipulate and cheat plaintiff Dubov. Such statements were false and known to be false when made. Defendant Lewis neither provided plaintiff Dubov with the information to file her taxes nor provided her with any loan proceeds.

49.     The available evidence leads to the cogent and compelling inference that defendant Lewis made these misstatements with scienter.  Indeed, if he ever sought a loan, it was for his own personal benefit:  to replace funds he had dissipated; to further the business of a company named "Medco International"; establish the business of his own company, NY Med (which he created in the form of a New York LLC on January 13, 2017); or, most likely of all to acquire $2.1 million from PHH Home Loans LLLC  to purchase his new luxury residence in Englewood Cliffs, NJ in or about December 2017, and not to pay off plaintiff Dubov.

**D.  Plaintiff Dubov's Financial Demise And Defendant Lewis' Financial Enrichment.**

50.     The 90-page manuscript of plaintiff Dubov's text message communications with defendant Lewis contains, literally, hundreds of requests for money from plaintiff Dubov, between January 3, 2014, and April 6, 2018. The requests, fairly read, reduced plaintiff Dubov to pleading and even begging defendant Lewis for money as time went on.

51.     From the beginning plaintiff Dubov emphasized to defendant Lewis that she relied upon the promised interest payments to pay her monthly apartment rent of $3550.

52.     By August 19, 2016, she texted to defendant Lewis copies of legal papers which she had received in connection with her non-payment of rent.  In response, defendant Lewis texted her:

> "No, that's not eviction papers, they send them to your door
> delivered by a person...Christine I can't talk at the moment."

53.     On September 10, 2016, plaintiff Dubov texted defendant additional court papers which she had received relating to her eviction, asking him to, ""Please call."  He did not.

54.     On September 29, 2016, plaintiff Dubov received a text from one of her neighbors, which she forwarded to defendant Lewis.  It said:

"Christine, someone stopped by your apt earlier this evening knocked on
our door when they weren't able to get you.  They were trying to locate
you....No name, about 5'10", tough to visually describe him.  He said the
bldg had hired him and there's an issue with timely rent payment.  He
was asking when...."

55.     On February 3, 2017, plaintiff Dubov texted defendant Lewis that she had to
resort to drawing down a $3600 cash advance on her credit card, at 27 percent interest, to pay
her rent.

56.     On March 14, 2017, plaintiff Dubov texted defendant Lewis:  "Your timing has
destroyed me financially.  And I am now being uprooted from my apartment."

57.     On April 30, 2017, plaintiff Dubov's lease expired.  Her landlord did not offer her
a new lease because of her poor payment record.  Reluctantly, she had to uproot herself after
many years as a resident of New York City and live with her adult children in California.

58.     While her New York City apartment rent had always been her first financial
concern, she understandably had many others, including ever- increasing credit card bills and
credit card interest payments, about all of which she contemporaneously informed defendant
Lewis.  For example, in addition reluctantly to accessing her high-interest credit card line of
credit to pay her rent, she had to pay $13,000 for extensive dental work during the time in
question, $2,000 for a landlord-tenant lawyer and, eventually, moving expenses upon leaving
New York City for California in May 2017.

59.     Plaintiff Dubov kept defendant Lewis apprised of each of the financial needs as
well as the enormous emotional stress and physical deterioration that his broken promises of
payment had caused her.

60.     Sometimes in response to her entreaties for money, he said, dismissively, that: he was traveling, suffering from jet lag, or that he was in a meeting.  He sometimes said that his purported efforts on her behalf were being hampered:   by weather, by his difficulty exchanging foreign currency into U.S. dollars, or, one time, by a national holiday in some North African country.

61.     As plaintiff's pleas became more desperate, defendant Lewis countered with more elaborate excuses.  On October 3, 2017, he said that he was delayed as a result of his wife's alleged miscarriage.  That excuse was preceded six months earlier, on March 10, 2017, by the excuse that he was having his wisdom teeth extracted.  Both before and after these excuses, defendant Lewis resorted to explaining his delay by saying that: "I'm in the hospital my wife had to have surgery today." (February 1, 2017); and "my wife had to have a Medical procedure today, so I haven't been available". (November 21, 2017.)

62.     Plaintiff especially expressed her desperation between May 7, 2017, and January 22, 2018.  On May 7, 2017, plaintiff Dubov texted defendant Lewis:

> "You have left me hanging and let me down.  The ramifications of being penniless is not only destroying me, it is devastating my children."

63.     On January 16, 2018, plaintiff Dubov had reminded defendant Lewis that she had entrusted him "with my whole life savings.  Please respect my trust in you.  Please come through."

64.     The news that plaintiff Dubov had been reduced to penury had no impact whatsoever on defendant Lewis who had enriched himself at plaintiff's expense and was enjoying the trappings of the high life.  Upon information and belief, in 2014 he paid off his mother's Wells Fargo mortgage on her home in Philadelphia, PA; started his own medical

15

appliance business in January 2017; and made a $600,000 down-payment on his own $2.7 million dollar home, in or about December 2017, in Englewood Cliffs, NJ.

### C.     Defendant EMRI Capital LLC.

65.     In all, defendant Lewis sent 30 interest payments, totaling $186,500, to plaintiff Dubov in the four years and nine months from July 10, 2013, to April 9, 2018. The typically small wire transfers (usually between $2,500 and $6,000) that she irregularly received from him always came, not from defendant ECP LLC, but from defendant EMRI, a Delaware LLC created in 2008, *via* wire transfer by EMR from the Chase Bank branch in the Bergen Mall, Maywood, NJ, near defendant Lewis' residences in Ft. Lee, NJ, and Englewood Cliffs, NJ..

66.     Plaintiff Dubov has no idea of the nature of the relationship between defendant Lewis and defendant EMRI.  Plaintiff Dubov knows only that the money appeared from defendant EMRI after she begged defendant Lewis for funds.  The inference is cogent and compelling that defendant Lewis controlled defendant EMRI and that entity was a conduit through which Lewis kept and moved money.

### FIRST CLAIM AGAINST DEFENDANTS ECP LLC, LEWIS AND PERRY – BREACH OF CONTRACT

67.     Plaintiff Dubov repeats and re-alleges all of the allegations set forth in paragraphs 1 to 66 above.

68.     On or about July 10, 2012, plaintiff Dubov entered into a valid and binding FCEA with defendant ECP and with defendant Perry.

69.     Pursuant to that FCEA plaintiff Dubov agreed to deposit $325,269.38 with defendant ECP LLC.  In return defendants ECP LLC and Perry agreed to invest plaintiff's money in "Brazilian Long Term Notes" a/k/a Brazilian "Government bonds".  Additionally, those

defendants obligated themselves to pay plaintiff Dubov interest on her investment "equal to a total of 20% return per 90 days of each". Said interest payments were to begin, under the express terms of the FCEA "after the first 90 days of receipt of [plaintiff Dubov's] initial investment". Moreover, under the FCEA, "[o]nce the interest payments begin, the client will receive interest payments on a monthly basis." (Exhibit 2 at 1.)

70.     On July 3, 2012, plaintiff Dubov transferred $120,992.32 to defendant ECP LLC. On July 5, 2012, plaintiff Dubov transferred another $204,777.06 to defendant ECP LLC, completing her contractual obligations. (Exhibit 3.) Once she had transferred her $325,269.38 to defendant ECP LLC, plaintiff Dubov's contractual obligations were complete and the FCEA became executory.

71.     Under the terms of the FCEA, plaintiff Dubov should have received a total of approximately $216,856 in interest payments through July 5, 2013. Also, if the FCEA were not to be renewed at the end of one year, plaintiff would have been entitled to a refund of her $325,269.38 at that time (viz., on July 10, 2013). The FCEA was not renewed and plaintiff Dubov never received back her $325,269.38

72.     Defendant ECP LLC and defendant Perry failed to comply with a single obligation under the FCEA and, further, violated their implied duty of good faith and fair dealing as contracting parties.

73.     Sometime prior to November 15, 2013, on a date presently unknown to plaintiff Dubov, defendants ECP LLC and Perry abrogated the FCEA by failing to invest plaintiff Dubov's funds in the Brazilian Long Term Notes as required by the FCEA.

74.     Instead, defendant Lewis, with the substantial knowledge, assistance and encouragement of defendants ECP LLC and Perry, took plaintiff Dubov's money into his own possession, custody and control, for use as his own.  The inference of scienter on the parts of these three defendants is cogent and compelling.

75.     The breach of the FCEA by defendants ECP LLC, Perry and Lewis, resulted in damage to plaintiff Dubov in the amount of $531,036.44.

**PLAINTIFF'S SECOND CLAIM AGAINST DEFENDANT LEWIS – COMMON LAW FRAUD**

76.     Plaintiff Dubov repeats and re-alleges all of the allegations set forth in paragraphs 1 through 75 above.

77.     Defendant Lewis made numerous material misrepresentations of fact, which statements were false and known to be false by defendant Lewis, for the purpose of successfully inducing plaintiff Dubov to reasonably rely on those misrepresentations to her detriment, viz., by not demanding the return of her money and refraining to sue defendant Lewis.  Further, defendant Lewis concealed material facts and ignored plaintiff Dubov's repeated requests for information.  Such misrepresentations and concealments were part of defendant Lewis' scheme to defraud plaintiff Dubov.  Defendant Lewis engaged in numerous transactions, acts, practices and courses of business -- including, but not limited to, sending small amounts of money irregularly to plaintiff through his conduit, defendant EMRI – which operated a fraud, deceit and manipulation upon plaintiff Dubov.

78.     First among these misstatements were his representations to plaintiff, made face-to-face on February 26, 2013, at the *Nice Matin* restaurant in Manhattan that plaintiff's

money was invested in an enterprise called "Medco International", and that such investment was "insured". Plaintiff's investment funds were never "insured". No evidence of insurance was ever provided to plaintiff Dubov. No insurance proceeds were ever provided to her.

79.     Second, defendant Lewis further deceived plaintiff Dubov by concealing, and failing to provide her with any documentation relating: to her investment, to the tax obligations arising therefrom, or to the loan he allegedly was seeking -- despite her requests *via* text messages she sent to him on numerous occasions. Such omissions occurred approximately 20 times as reflected in plaintiff Dubov's text messages to defendant Lewis between February 26, 2013, and March 7, 2018. (Exhibit 4 at 3, 4, 8, 17, 18, 19, 25, 29, and 30; and Exhibit 6 at 62, 68, 71, 72, 79, and 89.) Prior to May 2, 2017, plaintiff sent these text messages from New York City, except for the one on April 23, 2015, which she sent from Pittsburgh, PA. The text messages she sent on May 8, 10 and 22, 2017, and March 5 and 7, 2018, were all sent from California. Plaintiff has no idea where defendant Lewis was when he received these cell-phone texts.

80.     Third, defendant Lewis knowingly made at least thirteen misrepresentations to plaintiff Dubov regarding a loan which he, allegedly, was either in the process of obtaining, or had obtained, in order to buy her out of her investment and pay her back taxes on that investment, including any penalties assessed by the taxing authorities. (Exhibit 4 at 26; Exhibit 5 at 32, and 34; and Exhibit 6 at 73, 74, 78, 79, 85, 88, and 90.)

81.     Plaintiff Dubov received all of these loan-related, cell-phone text messages while she was in New York City (before May 2, 2017), or after she moved to California (after May 2, 2017). She does not know where defendant Lewis was when he sent the text messages.

82.     If defendant Lewis were pursuing any kind of loan or line-of-credit during the period in question, it was never to pay plaintiff Dubov. His representations to the contrary were made with scienter. If defendant Lewis was in fact seeking a loan, the evidence is cogent and compelling that any such loan was sought either to assist defendant Lewis in his various business endeavors, whether as a member of ECP LLC, in opening his own business, defendant NY Med, or most likely of all, financing his penchant for the high life, including the purchase of his $2.7 million home in Englewood Cliffs, NJ.

83.     This is not the first instance in which defendant Lewis cheated, through his fraud and deceit, a vulnerable female, older than himself, of substantial funds. In 2012 Ms. Katie Loeb of Philadelphia, PA (believed to be defendant Lewis' home town) filed a complaint in New York state court accusing defendant Lewis of defrauding her out of $100,000, with a contract bearing several points of similarity with the FCEA described above. (Exhibit 7.) After receiving a few small payments amounting to approximately $15,000, Ms. Loeb never heard from defendant Lewis again. According to Ms. Loeb defendant Lewis drove a Porsche automobile when he took her money. There may be other examples of defendant Lewis' perfidy, unknown at this time to plaintiff Dubov, but known to defendant Lewis.

### PLAINTIFF'S THIRD CLAIM AGAINST DEFENDANTS ECP LLC, PERRY AND LEWIS – BREACH OF FICUCIARY DUTY

84.     Plaintiff Dubov repeats and re-alleges all of the allegations set forth in paragraphs 1 through 83 above.

85.     As brokers defendants ECP LLC and Perry owed plaintiff Dubov a fiduciary duty with respect to the completion of the purchase of Brazilian Long Term Notes on her behalf.

86.     In connection therewith, defendants ECP and Perry were under a duty to hold plaintiff Dubov's funds in escrow unless and until such time as they were able to purchase the Brazilian Long Term Notes as agreed, or to return those funds to her if they were not so used.

87.     That fiduciary duty arose as a matter of public policy. The same conduct which constituted a breach of contract by defendants ECP LLC and Perry constituted a breach of the larger fiduciary duty they wed to plaintiff Dubov. That duty derives from public policy and was independent of the contract itself.

88.     A fiduciary duty signifies a relationship of trust and confidence whereby the agent is bound to exercise the utmost good faith and undivided loyalty toward the principal throughout the relationship.

89.     Defendants ECP LLC and Perry breached their fiduciary duty to plaintiff Dubov when, sometime prior to November 15, 2012, they became aware of their inability to acquire the required Brazilian Long Term Notes and failed immediately to so advise plaintiff Dubov, but rather placed those funds in the possession, custody and control of defendant Lewis, without authority to do so from plaintiff Dubov.

90.     Plaintiff Dubov, by the actions of defendants ECP LLC and Perry, was thus damaged by being deprived of her money and of any control over it, to this very day.

91.     Additionally, sometime prior to February 26, 2013, defendant Lewis personally took possession, custody and control over plaintiff Dubov's funds. In doing so be became a fiduciary to her regarding the disposition of those funds. That was the case even though there was no writing between them.

92.    Defendant Lewis' fiduciary duty to plaintiff Dubov arose from the true nature of the relationship of those parties, viz., that plaintiff Dubov was a passive investor who was entirely dependent on defendant Lewis to act in her best interest.  They were dealing on unequal terms due to plaintiff Dubov's lack of financial acumen and sophistication and her complete reliance on defendant Lewis.  Plaintiff Dubov, a widow and senior citizen, justifiably reposed trust and confidence in defendant Lewis and relied on his representations of superior expertise or knowledge.

93.    Defendant Lewis breached his fiduciary duty to plaintiff Dubov from the date he took the funds she originally entrusted to defendants ECP and Perry to this very day.

94.    Furthermore, by means of fraud, misrepresentations, concealment and active deception, defendant Lewis successfully induced plaintiff Dubov to refrain from either demanding the immediate return of her funds or from commencing a lawsuit against him for the return of her funds until April 6, 2018.  Plaintiff Dubov reasonably relied on such fraud, misrepresentations, concealment and active deception and did refrain from demanding the return of her investment funds until April 6, 2018, and from bringing suit against defendant Lewis until this day.

## PLAINTIFF'S FOURTH CLAIM AGAINST DEFENDANTS ECP LLC, AND PERRY – AIDING AND ABETTING

95.    Plaintiff Dubov repeats and re-alleges all of the allegations set forth in paragraphs 1 through 94 above.

96.    Defendants ECP LLC and Perry, the CEO of defendant ECP LLC, gave substantial assistance or encouragement to defendant Lewis in carrying out his scheme of fraud, deceit and

manipulation against plaintiff Dubov by transferring plaintiff Dubov's investment moneys from defendant ECP LLC to defendant Lewis at some date prior to February 26, 2013. Defendant Lewis could not have transferred that money without substantial assistance or encouragement from defendants ECP LLC and Perry.

97.     Defendants ECP LLC and Perry knew that defendant Lewis' conduct in taking possession, custody and control over plaintiff's funds was a breach of defendant Lewis' fiduciary duty to plaintiff.

98.     Defendant Lewis' breach of fiduciary duty to plaintiff resulted in harm to plaintiff Dubov.

### PLAINTIFF'S FIFTH CLAIM AGAINST DEFENDANTS LEWIS, EMRI AND NY MED – MONEY HAD AND RECEIVED

99.     Plaintiff Dubov repeats and re-alleges all of the allegations set forth in paragraphs 1 through 98 above.

100.    Defendants Lewis, and, upon information and belief, EMRI and NY Med, received money belonging to plaintiff Dubov.

101.    These defendants benefitted from the receipt of the money.

102.    Under principles of equity and good conscience these defendants should not be allowed to keep plaintiff Dubov's money.

### PLAINTIFF'S SIXTH CLAIM AGAINST DEPENDANTS LEWIS AND EMRI – CONVERSION BY WRONGFUL DETENTION

103.    Plaintiff Dubov repeats and re-alleges all of the allegations set forth in paragraphs 1 through 102 above.

104.   Defendants Lewis and EMRI are liable to plaintiff Dubov for conversion by wrongful detention.

105.   The property converted by defendants Lewis and EMRI was the specifically identifiable $325,269.38 transferred to defendant ECP LLC *via* two wire transfers, from plaintiff Dubov, $120,992.32 on July 3, 2012, and $204,777.06 on July 5, 2012. Upon information and belief, those funds were then transferred to defendants Lewis and/or EMRI on some date after November 15, 2012, but before July 10, 2013.

106.   Plaintiff Dubov's money was provided to ECP LLC for a specific investment purpose. In receiving her money, defendants ECP LLC and Perry became fiduciaries for plaintiff Dubov. When he received those funds subsequently, defendant Lewis in turn became a fiduciary to plaintiff Dubov.

107.   Defendants Lewis and EMRI intended to exercise such control over plaintiff Dubov's funds as to interfere with plaintiff's use and enjoyment of those funds.

108.   On or about April 6, 2018, plaintiff Dubov, by means of a letter from her attorney, demanded the return of her funds from defendant Lewis. (Exhibit 8.) Defendant Lewis neither complied with that request, nor did he direct defendant EMRI to comply. Instead, defendant Lewis and defendant EMRI dealt with plaintiff Dubov's money in a manner inconsistent with plaintiff Dubov's rights. They kept it. Whereby, plaintiff Dubov was injured in the amount of $325,269.38.

**PLAINTIFF'S SEVENTH CLAIM AGAINST DEFENDANTS LEWIS, ECP LLC, PERRY AND EMRI –
PROMISSORY ESTOPPEL**

109.    Plaintiff Dubov repeats and re-alleges all of the allegations set forth in
paragraphs 1 through 108 above.

110.    On April 6, 2016, defendant Lewis texted plaintiff Dubov regarding the potential
tax penalty she faced in moving her funds from her Fidelity IRA to the Brazilian Long Term
Notes. "I know Christine I will do that, we will absorb the penalty." (Exhibit 5 at 31.)

111.    Plaintiff Dubov reasonably relied on defendant Lewis' promises to her detriment.
Upon defendant Lewis' promise, she neither demanded the immediate return of her money nor
did she sue defendant Lewis.  Plaintiff Dubov's reliance was foreseeable by defendant Lewis.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Dubov demands judgment against defendants as follows:

(A)    On Plaintiff's FIRST CLAIM FOR RELIEF, an award of money damages against
defendants ECP LLC, Perry and Lewis, jointly and severally,  in the amount of $531,036.44; plus
an award of pre-judgement interest, jointly and severally against those defendants, at the rate
of nine (9) percent from November  15, 2012, or such earlier date as may be proven from the
evidence;

(B)    On Plaintiff's SECOND CLAIM FOR RELIEF, an award of money damages against
defendant Lewis in the amount of $325,269.38 plus nine (9) percent pre-judgement interest
from February 26, 2013, or from such earlier date as defendant Lewis took possession, custody
and control of plaintiff Dubov's funds..  Plaintiff Dubov also seeks an award on this claim against

defendant Lewis in the amount of Five Million Dollars ($5,000,000.00) for punitive or exemplary damages for defendant Lewis' wanton, predatory, malicious and oppressive conduct;

(C)    On Plaintiff's THIRD CLAIM FOR RELIEF, an award of money damages, jointly and severally against defendants ECP LLC, Perry and Lewis, in the amount of $325,269.38, plus pre-judgement interest at the rate of nine (9) percent from November 15, 2012, or whatever earlier date defendants ECP LLC, and Perry determined that they could not acquire the Brazilian Long Term Notes but did not return plaintiff Dubov's money to her.   Plaintiff further demands an award of money damages against defendant Lewis in the amount of $325,269.38, plus pre-judgement interest at the rate of nine (9) percent from February 26, 2013, or whatever earlier date defendant Lewis received possession, custody and control of plaintiff Dubov's $325,269.38 from defendants ECP LLC and defendant Perry.  Plaintiff Dubov also seeks an award of punitive or exemplary damages in the amount of Five Million Dollars ($5,000,000.00) against defendant Lewis for defendant Lewis' wanton, predatory, malicious and oppressive conduct;

(D)    On Plaintiff's FOURTH CLAIM FOR RELIEF, an award of money damages, jointly and severally against defendants ECP LLC and Perry, in the amount of $325,269.38, plus pre-judgment interest at the rate of nine (9) percent from February 26, 2013,  or whatever earlier date on which those defendants gave possession, custody and control of plaintiff Dubov's funds to defendant. Plaintiff Dubov also seeks an award on this claim from defendants ECP LLC and Perry in the amount of Five Million Dollars ($5,000,000.00) for punitive or exemplary damages for defendants ECP LLC and Perry's wanton, malicious and oppressive conduct

(E)    On Plaintiff's FIFTH CLAIM FOR RELIEF, an award of money damages, jointly and severally against defendants Lewis, EMRI and NY Med in the amount of $325,269.38, plus pre-

judgement interest at the rate of nine (9) percent from such date as each of these defendants came into possession of plaintiff Dubov's funds.

(F)     On Plaintiff's SIXTH CLAIM FOR RELIEF, an award of money damages, jointly and severally against defendants Lewis and EMRI, in the amount of $325,269.38, plus pre-judgement interest at the rate of nine (9) percent from April 6, 2018.  Plaintiff Dubov also demands an award of punitive or exemplary damages, jointly and severally, against defendants Lewis and EMRI in the amount of Five Million Dollars ($5,000,000.00) because their conduct was wanton and deliberate and demonstrates a high degree of moral culpability.  Alternatively, plaintiff Dubov demands the imposition of injunctive relief against defendants ECP LLC, Perry and Lewis, prohibiting them, jointly and severally, from failing and refusing to return her funds or using them for any purpose other than to refund them to her;

(G)     On Plaintiff's SEVENTH CLAIM FOR RELIEF, the entry of a declaratory judgment against defendants Lewis, ECP LLC, and EMRI, requiring them, jointly and severally, to pay any penalties imposed on plaintiff Dubov by any taxing authority by reason of plaintiff Dubov transferring funds from her Fidelity IRA to ECP LLC on July 3, 2012 and July 5, 2012.  Further, consequential relief may be required to enforce this Court's declaratory judgment; and

(H)  Plus costs and such other and further relief ass this Court deems just and proper.

Dated:  Brooklyn, New York
        April 30, 2018

                                        LAW OFFICES OF RONALD P. MYSLIWIEC


                                        By:_s/_____
                                            Ronald P. Mysliwiec, Esq. (RM 8926)
                                            530 Third Street
                                            Brooklyn, NY 11215
                                            (718) 768-4581
                                            rpm@rpmlawny.com
                                            Attorneys for Plaintiff Christine Dubov